**NO. 20-11179**

***IN THE UNITED STATES COURT OF APPEALS***
***FOR THE FIFTH CIRCUIT***

DATA MARKETING PARTNERSHIP, L.P.;
L.P. MANAGEMENT SERVICES, L.L.C.,
PLAINTIFFS - APPELLEES

V.

UNITED STATES DEPARTMENT OF LABOR; MARTIN WALSH,
SECRETARY, U.S. DEPARTMENT OF LABOR;
UNITED STATES OF AMERICA,
DEFENDANTS - APPELLANTS

**ON APPEAL FROM THE U.S. DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**CASE NO. 4:19-cv-00800-O (O'CONNOR, J.)**

**BRIEF OF *AMICI CURIAE* PENNSYLVANIA INSURANCE DEPARTMENT, COLORADO DIVISION OF INSURANCE, CONNECTICUT INSURANCE DEPARTMENT, DISTRICT OF COLUMBIA DEPARTMENT OF INSURANCE, SECURITIES & BANKING, HAWAI`I INSURANCE DIVISION, MAINE BUREAU OF INSURANCE, MARYLAND INSURANCE ADMINISTRATION, NEW MEXICO OFFICE OF SUPERINTENDENT OF INSURANCE, OREGON DEPARTMENT OF CONSUMER & BUSINESS SERVICES – DIVISION OF FINANCIAL REGULATION, SOUTH DAKOTA DEPARTMENT OF LABOR & REGULATION - DIVISION OF INSURANCE, VERMONT DEPARTMENT OF FINANCIAL REGULATION – INSURANCE DIVISION, AND WASHINGTON OFFICE OF INSURANCE COMMISSIONER IN SUPPORT OF DEFENDANTS - APPELLANTS AND REVERSAL**

AMY G. DAUBERT
Chief Counsel
KATHRYN MCDERMOTT SPEAKS *
Senior Litigation Counsel
SANDRA L. YKEMA
Department Counsel
1341 Strawberry Square
Harristown State Office Building. No. 1
Harrisburg, PA 17120
Telephone: (717) 787-2567
Counsel for *Amicus Curiae*
Pennsylvania Insurance Department

* Counsel of Record (lead) for filing

(Additional counsel listed on signature page)

Date Filed: April 7, 2021

**SUPPLEMENTAL CERTIFICATE OF INTERESTED PARTIES**

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel certifies the following list of persons and entities have an interest in this amici curiae brief. These representations are made so the judges of this Court may evaluate potential disqualification or recusal.

*Amici Curiae* Insurance Regulatory Agencies on this Brief:

Pennsylvania Insurance Department
(led by Commissioner Jessica K. Altman)
Colorado Division of Insurance
(led by Commissioner Michael Conway)
Connecticut Insurance Department
(led by Commissioner Andrew N. Mais)
District of Columbia Department of Insurance, Securities & Banking
(led by Commissioner Karima M. Woods)
Hawai`i Insurance Division
(led by Commissioner Colin M. Hayashida)
Maine Bureau of Insurance
(led by Superintendent Eric A. Cioppa)
Maryland Insurance Administration
(led by Commissioner Kathleen A. Birrane)
New Mexico Office of Superintendent of Insurance
(led by Superintendent Russell Toal)
Oregon Department of Consumer & Business Services – Financial Regulation Division
(led by Commissioner Andrew R. Stolfi)
South Dakota Department of Labor and Regulation -Division of Insurance
(led by Director Larry D. Deiter)
Vermont Department of Financial Regulation
(led by Commissioner Michael S. Pieciak)
Washington Office of Insurance Commissioner
(led by Commissioner Mike Kreidler)

<u>Counsel for *Amici Curiae* Regulatory Agencies on this Brief:</u>

Amy G. Daubert, Pennsylvania Insurance Department
Kathryn McDermott Speaks, Pennsylvania Insurance Department
Sandra L. Ykema, Pennsylvania Insurance Department
Kyle McDaniel, Colorado Division of Insurance
Abby Chestnut, Colorado Division of Insurance
Jared T. Kosky, Connecticut Insurance Department
Adam Levi, District of Columbia Department of Insurance, Securities & Banking
Andre Beard, District of Columbia Department of Insurance, Securities & Banking
Paul Yuen, Hawai`i Insurance Division
Robert Alan Wake, Maine Bureau of Insurance
J. Van Lear Dorsey, Maryland Insurance Administration
Bryan E. Brock, New Mexico Office of Superintendent of Insurance
Pramela Reddi, Oregon Department of Consumer & Business Services – Financial Regulation Division
Frank A. Marnell, South Dakota Department of Labor and Regulation -Division of Insurance
Gavin Boyles, Vermont Department of Financial Regulation – Insurance Division
Marta DeLeon, Washington Office of Insurance Commissioner

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.......................................................................v

TABLE OF AUTHORITIES ..................................................................... vii

STATEMENT OF INTEREST OF *AMICI CURIAE* ..........................................1

SUMMARY OF ARGUMENT ......................................................................3

ARGUMENT ...........................................................................................5

I. CONSUMER PROTECTION SAFEGUARDS ARE PARAMOUNT IN THE REGULATORY FRAMEWORK FOR HEALTH COVERAGE.......................................................................... 5

A. The Framework for the Regulation of Employer-based Coverage Accounts for the Competing Risks to the Covered Consumers........5

B. Alternative Coverage Arrangements Necessitate Carefully Designed Regulatory Approaches. ................................................10

i. Multiple employer welfare arrangements and similar schemes are subject to regulatory oversight in an effort to minimize consumer risk. .................................................... 10

ii. The history of MEWAs and similar arrangements demonstrates the need for regulatory oversight. ...................13

iii. Standards established to regulate non-conventional health coverage arrangements seek to protect consumers. ..............17

II. THE DATA MARKETING ARRANGEMENT IS A SUBTERFUGE THAT VIOLATES THE PURPOSE AND PROTECTIONS OF LEGITIMATE HEALTH COVERAGE, EXPOSING POTENTIAL INDIVIDUAL PARTICIPANTS TO MULTIPLE LAYERS OF DISCRIMINATION. ......................................................................19

A. The Data Marketing Scheme Is Not the Group Coverage It Purports to Be. ....19

B. Data Marketing's Self-serving Representations Should Not Bar States from Acting to Protect their Consumers. ....21

C. The Data Marketing Scheme Exposes Participants to Harm at Every Turn. ....22

CONCLUSION ....28

CERTIFICATE OF COMPLIANCE ....31

CERTIFICATE OF SERVICE ....32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Data Marketing Partnership, et al. v. U.S. Dept. of Labor, et al.*, 2020 WL 5759966 (N.D. Tx., Sept. 28, 2020) ....................................21

*Fuller v. Norton*, 86 F.3d 1016 (10th Cir. 1996) ..............................................15

*In re Il Nam Chang*, 539 B.R. 733 (Bankr. M.D. Pa. 2015)..............................22

*MDPhysicians & Assocs. v. State Bd. of Ins.*, 957 F.2d 178 (5th Cir. 1992) ........................................................................ 3, 15

*Olkowski v. Prudential Ins. Co. of America,* 597 F. Supp. 1197 (E. D. Pa. 1984) .........................................................................26

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ..............................................6

*Taggart Corp. v. Life and Health Benefits Admin., Inc.*, 617 F.2d 1208 (5th Cir.1980) ............................................................ 3, 15

## FEDERAL STATUTES AND REGULATIONS

29 U.S.C. § 1002(1) ...........................................................................21
29 U.S.C. § 1003(a) ...........................................................................21
29 U.S.C. § 1144(b)(2)(B) ......................................................................6
29 U.S.C. § 1144(b)(2)(A) ......................................................................7
29 U.S.C. § 1144(b)(6)....................................................................... 10, 14
29 U.S.C. § 1144(b)(6)(A)(i) ..................................................................10
42 U.S.C. § 300gg.................................................................................9
42 U.S.C. § 300gg(a)(1)(A)(iii) ..............................................................9
42 U.S.C. § 300gg-1............................................................................24
42 U.S.C. § 300gg-2....................................................................... 24, 25
42 U.S.C. § 300gg-6(a) .......................................................................24
42 U.S.C. § 18032(c) ...........................................................................9

45 C.F.R. § 147.104 ...........................................................................24
45 C.F.R. § 155.420 ...........................................................................24

## STATE STATUTES AND REGULATIONS

**District of Columbia**:

D.C. Code § 31-3301.01(20)....................................................................11
D.C. Code §§ 31-3303.13a-31-3303.13d.....................................................12
D.C. Code §§ 31-3461-31-3462...................................................................11

**Colorado**:

Colo. Rev. Stat. § 10-16-102(6)....................................................................13
Colo. Rev. Stat. § 10-16-102(61)(b)................................................................13
Colo. Rev. Stat. § 10-16-107(1)(a)....................................................................8

3 Colo. Code Regs. § 702-4:4-2-11...................................................................13

**Connecticut**:

Conn. Gen. Stat. § 38a-481..................................................................................8

**Hawai`i**:

Haw. Rev. Stat. § 431:10A-105.3......................................................................13
Haw. Rev. Stat. § 431:10A-105.6......................................................................25
Haw. Rev. Stat. § 431:10A-209.........................................................................13
Haw. Rev. Stat. § 431:14G-104...........................................................................8
Haw. Rev. Stat. §§ 431:16-201, *et seq.*...............................................................26

**Maine**:

Me. Rev. Stat. tit. 24-A, § 2736(2)........................................................................8
Me. Rev. Stat. tit. 24-A, § 2736-A..........................................................................8
Me. Rev. Stat. tit. 24-A, § 2808-B(2-B)(B)..............................................................8
Me. Rev. Stat. tit. 24-A, § 2809-A(1-A)..................................................................26

**New Mexico:**

NMSA 1978 § 59A-17-6........................................................................................8
NMSA 1978 §§ 59A-42-1 to 17...............................................................................26

13.19.4.8(1) NMAC....12
13.19.4.8(B)(1) to (3) NMAC....12
13.19.4.8(D) NMAC....12

**Pennsylvania**:

40 Pa. Stat. § 3801.304....8
40 Pa. Stat. § 46....11
40 Pa. Stat. § 756.2(a)(2)....13
40 P.S. §§ 991.1701, *et seq*.....26

**Oregon**:

Or. Rev. Stat. § 743.018....8
Or. Rev. Stat. § 750.303....12
Or. Rev. Stat. §§ 734.750, *et seq*.....26

**South Dakota**:

S.D. Codified Laws § 58-24-5....8
S.D. Codified Laws § 58-6-1....12
S.D. Codified Laws §§ 58-18-3 - 58-18-6....12
S.D. Codified Laws § 58-18-88....12, 13

S.D. Admin. R. 20:06:42....13

**Vermont**:

Vt. Stat. Ann. tit. 8, § 4062(a)(3)....8
Vt. Stat. Ann. tit. 8, § 4079a....13
Vt. Stat. Ann. tit. 8, § 4151, *et seq*.....26

**Washington:**

Wash. Rev. Code § 48.19.020....8
Wash. Rev. Code § 48.125....12

**EBSA ADVISORY OPINIONS**

United States Department of Labor Advisory Opinion 2020-01A https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/advisory-opinions/2020-01a.pdf .................................................... 18, 20

**OTHER AUTHORITIES**

Connecticut Insurance Department Bulletin HC-43 (July 25, 1990) https://portal.ct.gov/-/media/CID/HC43pdf.pdf ...............................................11

https://denver.cbslocal.com/2011/04/05/health-plan-founder-faces-money-laundering-charges/ (accessed April 6, 2021)...................................................17

https://www.denverpost.com/2012/03/30/insurance-executive-sentenced-to-5%C2%BD-years-for-fraud/ (reports of individual operating a self-funded "insurance" scheme for small employers who pleaded guilty to fraud and money-laundering) (accessed April 6, 2021) ..............................................................17

ERISA OVERSIGHT REPORT OF THE PENSION TASK FORCE OF THE SUBCOMMITTEE ON LABOR STANDARDS, HOUSE COMMITTEE ON EDUCATION AND LABOR, H.R. Doc. No. 342-9, 94th CONG., 2d Sess. (Jan. 3, 1977), available at https://ufdc.ufl.edu/AA00022220/00001/3j .............. 3, 15, 21

Health Insurance Coverage in the United States: 2019, Katherine Keisler-Starkey and Lisa N. Bunch (issued September 2020) https://www.census.gov/content/dam/Census/library/publications/2020/demo/p60-271.pdf ..........................................................................................5

Insurance Commissioner Memorandum 2005-1H of Hawai`i (August 11, 2005) http://cca.hawaii.gov/ins/files/2014/01/commissioner-memorandum-2005-1h.pdf .......................................................................11

January 11, 2018 Order of South Dakota https://dlr.sd.gov/insurance/admin_actions/documents/2018/aeu_holdings_black_wolf_consulting_williams_manny_inc.pdf ........................................................17

May 14, 2010 Cease and Desist Order of Maine https://www.maine.gov/pfr/insurance/legal/administrative_actions/licensee-discipline_consent-agreements/2010-2014/pdf/10-207_Final.pdf......................15

*Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation* (2013), available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf ........................................................................... 7, 14

*Private Health Insurance: Employers and Individuals Are Vulnerable to Unauthorized or Bogus Entities Selling Coverage*, United States General Accounting Office Report GAO-04-312, Feb. 2004, https://www.gao.gov/assets/250/241559.pdf.....................................................16

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The Pennsylvania Insurance Department, led by Insurance Commissioner Jessica K. Altman (the "Pennsylvania Department"), along with the Colorado Division of Insurance; Connecticut Insurance Department; District of Columbia Department of Insurance, Securities & Banking; Hawai`i Insurance Division; Maine Bureau of Insurance; Maryland Insurance Administration; New Mexico Office of Superintendent of Insurance; Oregon Department of Consumer & Business Services - Division of Financial Regulation; South Dakota Department of Labor & Regulation - Division of Insurance; Vermont Department of Financial Regulation - Insurance Division; and Washington Office of Insurance Commissioner (collectively, the "Departments"), respectfully submit this *amici curiae* brief in support of the appeal of the United States Department of Labor before the Fifth Circuit Court of Appeals ("Appeal").

The Departments are charged with administering the laws regulating the business of insurance in their respective states. As the primary regulators of group and individual health insurance policies sold in their states, the Departments are tasked with protecting consumers by ensuring that: (1) when they shop for health insurance coverage, they are not subject to misrepresentations or misleading or deceptive marketing; (2) any limitations to the policies are clear; (3) any policy a consumer chooses to purchase is administered properly, with claims adjudicated

fairly and accurately; and (4) the insurer maintains the funds necessary to pay all claims when due.

## SUMMARY OF ARGUMENT

ERISA expressly preserves the states' power to regulate the insurance market. The Data Marketing arrangement is a subterfuge to sell health insurance to the general public while avoiding state regulation. But such arrangements are not ERISA plans, and should not be permitted to skirt state regulation. The words of a Congressional Committee decades ago could apply to Data Marketing as well as they did to the "entrepreneurial venture[s]" that triggered that Committee's report:

> [T]hese plans are established and maintained . . . for the purpose of marketing insurance products or services to others. … They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.[1]

State regulation exists to protect consumers from schemes that purport to provide health coverage but fall short, either because those schemes lack the fiduciary construct to motivate properly robust coverage, or because those operating the scheme lack the financial acumen or interest to appropriately provide the coverage, or both. This state system protects consumers who may fall prey to

---

[1] ERISA OVERSIGHT REPORT OF THE PENSION TASK FORCE OF THE SUBCOMMITTEE ON LABOR STANDARDS, HOUSE COMMITTEE ON EDUCATION AND LABOR, H.R. Doc. No. 342-9, 94th CONG., 2d Sess. (Jan. 3, 1977), at 10, available at https://ufdc.ufl.edu/AA00022220/00001/3j, *cited with approval in MDPhysicians & Assocs. v. State Bd. of Ins.*, 957 F.2d 178, 184 (5th Cir. 1992) and *Taggart Corp. v. Life and Health Benefits Admin., Inc.,* 617 F.2d 1208, 1210 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981).

such schemes, as well as the broader population of consumers in the health insurance marketplace that will see a deleterious impact from Data Marketing-type arrangements drawing healthy individuals out of the commercial marketplace, while dumping less healthy individuals into it.

People who are lured towards the Data Marketing arrangement and similar schemes are exposed to misleading marketing, discrimination in enrollment, gaps in coverage, unfair claims handling, and financial peril. Data Marketing and similar schemes, if allowed to operate without oversight by state regulators, will harm the very consumers that state insurance regulators strive to protect.

# ARGUMENT

## I. CONSUMER PROTECTION SAFEGUARDS ARE PARAMOUNT IN THE REGULATORY FRAMEWORK FOR HEALTH COVERAGE.

Health care is an essential element to every individual's well-being. How health care will be paid for is therefore critical. For most, it is paid for through a coverage arrangement, whether through public or quasi-public government programs, such as Medicare or Medicaid, or through privately purchased coverage. Regulatory oversight of that privately purchased coverage is necessary to ensure that the consumer understands the coverage offered and gets the coverage promised.

### A. The Framework for the Regulation of Employer-based Coverage Accounts for the Competing Risks to the Covered Consumers.

More than half of Americans receive their health coverage through their employers.[2] Offering health coverage as an employee benefit makes sense because it helps the employer attract and retain employees, maintain a healthy workforce, and sustain corporate goodwill and reputation. An employer may choose to fund the coverage on its own, or purchase the coverage from an insurance company that must meet appropriate solvency and other regulatory requirements.

---

[2] *See, e.g.*, Health Insurance Coverage in the United States: 2019, Katherine Keisler-Starkey and Lisa N. Bunch (issued September 2020) https://www.census.gov/content/dam/Census/library/publications/2020/demo/p60-271.pdf , *esp. at* Figure 1.

An employer that self-funds the coverage bears two elemental risks: 1) that claims will exceed the expected expenses, and 2) that the funds set aside will be inappropriately managed, leaving insufficient funds available when claims are made. The risk to the worker that the coverage will not be delivered as promised is countered by the employer's self-interest: the employer, to sustain itself as a going concern, needs to maintain its reputation, shareholder value, goodwill, and a healthy and satisfied workforce. The United States Department of Labor is charged with providing primary regulatory oversight of this employee benefit when it is self-funded by a single employer. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983) ("subject[ing] to federal regulation plans providing employees with fringe benefits"). Consistent with that allocation of responsibility, ERISA's "deemer clause" prohibits states from imposing their own insurance laws on a self-insured employer by deeming the employer to be an insurance company.[3]

An employer may further moderate its risk by purchasing health coverage for its employees from an insurance company. The insured coverage, like the self-funded coverage, has the same two elemental risks: 1) that claims will exceed the expected expenses, and 2) that the funds set aside will be inappropriately managed such that there are insufficient funds available when claims are made. However, those risks have been transferred to an insurance company when an employer

[3] ERISA § 514(b)(2)(B) (29 U.S.C. § 1144(b)(2)(B)).

provides insured coverage, and under federal law the states – and not DOL – exercise regulatory oversight over the insurance company and the coverage it provides.[4] The state regulatory construct for employer group coverage accounts for the fact that an insurance company is not interacting with the individual consumers in their capacity as employees, but rather as beneficiaries under an insurance policy. That is, in the case of insured coverage, the insurance company does not have the employer's goodwill and reputation as incentives to fairly provide coverage to all the employees. Therefore, in addition to the employer's self-interest as an employer and business, there are nondiscrimination rules in place to assure that the insurer may not discriminate against individual employees. State regulators oversee insurance companies to assure that the group coverage complies with eligibility and coverage laws, and that the risks are properly addressed.

Small group coverage and individual coverage have still another layer of challenge, because the pool of individuals covered by a health plan is expanded beyond a single large business. Thus, the people covered by an individual or small group health plan do not have a unique reputation, a uniform set of shareholders, a

---

[4] *See* section 514(b)(2)(A) of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1144(b)(2)(A) (saving clause, preserving regulation of the business of insurance to the states). *See generally Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation* (2013), at 17, available at: https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

single corporate goodwill, or a discrete workforce. Consequently, in both the small group and individual coverage contexts, there again are nondiscrimination rules in place that extend across the markets so that an insurer may not discriminate against a single small group or individual.

Finally, whether insurance is issued to a large group, a small group, or an individual, the consumers are further protected because the coverage purchased from an insurance company must be actuarially rated to assure that the price charged is not "excessive, inadequate, or unfairly discriminatory." *See, e.g.,* C.R.S. § 10-16-107(1)(a) (Colorado); Conn. Gen. Stat. § 38a-481 (Connecticut); HRS § 431:14G-104 (Hawai`i); 24-A Me. Rev. Stat. §§ 2736(2), 2736-A & 2808-B(2-B)(B) (Maine); § 59A-17-6 NMSA 1978 (New Mexico); 40 P.S. § 3801.304 (Pennsylvania); ORS § 743.018 (for individual and small group markets) (Oregon); SDCL § 58-24-5 (South Dakota); 8 V.S.A. § 4062(a)(3) (Vermont); RCW § 48.19.020 (Washington). To satisfy that actuarial standard, the insurance company needs to factor in its projected exposure to claims in the risk pool – the collection of people counted for purposes of assessing the risk – so that it prices the coverage correctly to have sufficient funds to pay those claims.

Furthermore, for individuals, and for small employer groups, charging higher prices based on health status or health risk is considered unfair

discrimination as a matter of law. 42 U.S.C. § 300gg.[5] To spread the risk fairly, all individuals covered by the same insurer in each market must be combined in a single pool for pricing purposes, and small employers must be pooled in the same manner. 42 U.S.C. § 18032(c).

For a large employer insured group, the premium rating pool may be that group alone. Nevertheless, the large employer self-funded group similarly needs to assure that it "counts the cost" before committing to self-funding, so that it has sufficient funds to pay expected claims, otherwise the employer may cease to be a going concern and its business operation may fail. Moreover, whether insured or self-funded, a large employer group subsidizes the coverage, both as an employee benefit and as a means of self-interest: it is a mechanism for assuring that healthy employees will be in the risk pool, and not only those employees who anticipate in advance that they will have claims.

In all of these scenarios – large employer group self-funded plans or fully-insured large or small group plans or individual plans – the rules protecting against discrimination in the employment and insurance contexts serve as guards to protect against the risk that an individual or employee will be expelled to improve the profile of the risk pool, and the on-going business concerns and actuarial standards

[5] Rating based on age is permitted, but the variation in premium may not exceed a 3:1 ratio. 42 U.S.C. § 300gg(a)(1)(A)(iii).

protect against the risk that an individual's or employee's claims will be left unpaid.

### B. Alternative Coverage Arrangements Necessitate Carefully Designed Regulatory Approaches.

#### i. Multiple employer welfare arrangements and similar schemes are subject to regulatory oversight in an effort to minimize consumer risk.

Finally, subject to varying degrees of state oversight, there are other arrangements by which employers seek to make health coverage available to their employees, where employers seek to band together to offer coverage to the employees of multiple employers through a multiple employer welfare arrangement (MEWA) or multiple employer trust (MET), some of which operate through association health plans (AHPs) (collectively referred to as MEWAs). States may view these arrangements differently, depending on their experience with them, and depending on what laws the state may have in place to regulate these entities.[6] If permitted at all in a state, it is with the recognition that the entities participating in the MEWA have some level of shared business interest that outweighs whatever fringe benefits, such as health coverage, may be available through the MEWA. Yet there is an increased risk; because each employer funds

[6] MEWAs are subject to state regulation. *See* 29 U.S.C. § 1144(b)(6). Because a MEWA assumes risk in return for contributions paid by participating employers, the deemer clause does not exempt a MEWA from state laws regulating insurance, even if the MEWA is also an employee benefit plan. 29 U.S.C. § 1144(b)(6)(A)(i).

the coverage for its own employees, there is missing a sufficient countervailing interest by the larger group to provide health coverage for those subsidiary employer groups that may be less healthy and might drive up the cost of the coverage.

Some states do not allow MEWAs to operate at all without licensure as insurance companies, as doing the business of insurance without a certificate of authority is illegal. *See, e.g.*, 40 P.S. § 46; Connecticut Insurance Department Bulletin HC-43 (July 25, 1990) (https://portal.ct.gov/-/media/CID/HC43pdf.pdf; Insurance Commissioner Memorandum 2005-1H of Hawai`i (August 11, 2005) http://cca.hawaii.gov/ins/files/2014/01/commissioner-memorandum-2005-1h.pdf.

Other states have established a separate licensing process for MEWAs, or permit MEWAs to operate in some other manner within the state's regulatory construct. For example, the District of Columbia has a number of provisions that, taken together, make it clear that if a non-ERISA covered plan is offering a self-funded MEWA health benefit plan, it must either be regulated as a MEWA or have a certificate of authority as an insurance company. *See generally* D.C. ST § 31-3301.01(20) (defining "health benefit plan" as any accident and health insurance policy or contract issued by, among others, a MEWA), §§ 31-3461 – 31-3462 (federal health reforms acts incorporated into District law applicable to MEWAs, including "look-through" provisions for individual and small group employer plans

issued by MEWAs). *See also* D.C. ST §§ 31-3303.13a – 31-3303.13d (providing licensing requirements for all non-District domiciled MEWAs and District domiciled MEWAs that are self-insured; and the requirement that no MEWA offer short-term, limited-duration products without first being licensed). South Dakota likewise has regulatory provisions constraining the operation of MEWAs. *See* SDCL §§ 58-6-1 (certificate of authority needed to engage in business of insurance); SDCL §§ 58-18-3 through 58-18-6 (specific requirements for fully insured MEWAs, including AHPs); SDCL § 58-18-88 (licensing requirements for self-funded METs). *See also* ORS 750.303 (providing that self-funded MEWAs must obtain a certificate of multiple employer welfare arrangement); RCW Ch. 48.125 (requiring a certificate of authority to operate as a self-funded MEWA and establishing licensing requirements to obtain a certificate of authority). Additionally, New Mexico has adopted comprehensive regulations that require self-funded MEWAs to apply for and obtain registration prior to operating in the state (13.19.4.8(1) NMAC); including requirements that the MEWA is a *bona fide* association (13.19.4.8(B)(1) to (3) NMAC), not formed for the purpose of selling insurance (13.19.4.8(D) NMAC).

Similarly, even when MEWAs framed as associations are permitted to purchase insurance, state laws also are in place in multiple jurisdictions to protect consumers from associations that are not *bona fide*, that is, that are formed

primarily for the purpose of obtaining insurance. *See* C.R.S. § 10-16-102(6); *see also* C.R.S. § 10-16-102(61)(b) ("small employer" means any person, firm, corporation, partnership, or association that, among other requirements, "[w]as not formed primarily for the purpose of purchasing insurance."); 3 Colo. Code Regs. § 702-4:4-2-11 ("Groups formed for the purpose of insurance are prohibited under Colorado law"); 40 P.S. § 756.2(a)(2) (*inter alia*, association must be "maintained in good faith for purposes other than that of obtaining insurance"); ARSD Ch. 20:06:42 and SDCL § 58-18-88 (MEWAs and self-funded METs operating in South Dakota must be formed for purposes other than insurance). *Accord*, HRS §§431:10A-105.3, 431:10A-209 (association health plans must comply with Hawai`i state law).

But in some cases, state regulation means that new association health plans are prohibited altogether. 8 V.S.A. § 4079a (barring formation of new AHPs, with "grandfather clause" allowing AHPs that were or could have been formed under pre-2017 DOL and ERISA standards).

**ii. The history of MEWAs and similar arrangements demonstrates the need for regulatory oversight.**

MEWAs flourished – and failed – in the 1970's and early 1980's, evading state regulation by claiming to be "employee benefit plans" entitled to the

protection of ERISA's deemer clause. These claims were questionable, and often downright fraudulent, but they delayed the enforcement process long enough for the promoters to take the money and run. In 1983, Congress took action to subject all MEWAs to state insurance regulation, whether or not they were employee benefit plans. 29 U.S.C. § 1144(b)(6) (added to ERISA by section 302(b) of P.L. 97-473). *See also Multiple Employer Welfare Arrangements under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation*, Aug. 2013, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/mewa-under-erisa-a-guide-to-federal-and-state-regulation.pdf.

This Congressional action followed a study by the Committee on Education and Labor for the 94th Congress, which tellingly reported that:

> [C]ertain entrepreneurs have undertaken to market insurance products to employers and employees at large, claiming those products to be ERISA covered plans. . . . The entrepreneur will then argue that his enterprise is an ERISA benefit plan which is protected, under ERISA's preemption provision, from state regulation. … As described to us, these plans are established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others. … They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.
>
> . . .
>
> Where a "plan" is, in effect, an entrepreneurial venture, it is outside the policy of section 514 for reasons we have already stated. In short, to be properly characterized as an ERISA employee benefit plan, a plan must satisfy the definitional requirement of section 3(3) in both form and substance.

ERISA OVERSIGHT REPORT OF THE PENSION TASK FORCE OF THE SUBCOMMITTEE ON LABOR STANDARDS, HOUSE COMMITTEE ON EDUCATION AND LABOR, H.R. Doc. No. 342-9, 94th CONG., 2d Sess. (Jan. 3, 1977), at 10-11, available at https://ufdc.ufl.edu/AA00022220/00001/3j.[7]

A decade later, the reasons for this ERISA amendment, and subsequent state regulation, were clearly stated by the Court of Appeals for the Tenth Circuit:

> The impetus behind [the 1983 amendment to ERISA] was an interest in curbing abuses by multiple employer trusts, which would claim ERISA preemption when states attempted to regulate them as quasi-insurance companies. After thwarting state regulation, some of these uninsured trusts declared bankruptcy, leaving employees responsible for millions of dollars in unpaid hospital and medical bills. The purpose of the amendment was to make clear the extent to which state law is preempted with respect to employee benefit plans that are also MEWAs.
>
> . . .
>
> The MEWA amendment's sponsor in the House of Representatives viewed uninsured MEWAs as thinly disguised insurance arrangements that properly should be regulated at the state level.

*Fuller v. Norton*, 86 F.3d 1016, 1023-25 (10th Cir. 1996) (citations omitted).

After ERISA was amended to clarify and expand state regulation of MEWAs, many states, including Pennsylvania, Maine,[8] and Hawai`i, litigated

[7] This Court cited the Report with approval in *MDPhysicians & Assocs. v. State Bd. of Ins.*, 957 F.2d 178, 184 (5th Cir. 1992); and in *Taggart Corp. v. Life and Health Benefits Admin., Inc.,* 617 F.2d 1208, 1210 (5th Cir.1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981) (holding that a "proprietary enterprise, established and operated by independent businessmen for their personal profit" was not within the scope of ERISA).

[8] *See, e.g.*, May 14, 2010 Cease and Desist Order of Maine

numerous cases; obtained suspension, seizure and liquidation orders against illegal MEWAs and other unlicensed arrangements; and revoked the licenses of agents who sold policies for these entities. State insurance regulators investigated many different problematic MEWA scenarios, including bogus union plans and illegitimate allegedly fully insured association plans.

Ultimately, these illegal schemes left many consumers without coverage and with very little support. With no guaranty funds to pay unfunded claims – by law only available in the case of licensed insurance company insolvencies – state insurance departments did what they could to assist consumers. Even with state intervention, millions of dollars in unpaid claims remained. As noted in a 2004 government report, states reported that unauthorized entities had at least $252 million in unpaid claims nationwide from 2002-2004. *Private Health Insurance: Employers and Individuals Are Vulnerable to Unauthorized or Bogus Entities Selling Coverage*, United States General Accounting Office Report GAO-04-312, Feb. 2004, https://www.gao.gov/assets/250/241559.pdf.

This regulatory activity is ongoing: as recently as 2018, South Dakota took action against unlawful MEWAs, including issuing a Cease and Desist Order

---

https://www.maine.gov/pfr/insurance/legal/administrative_actions/licensee-discipline_consent-agreements/2010-2014/pdf/10-207_Final.pdf (finding against unlicensed respondents and in favor of 23 Maine residents among more than 12,400 victims of the scheme).

against several entities. *See*, January 11, 2018 Order of South Dakota https://dlr.sd.gov/insurance/admin_actions/documents/2018/aeu_holdings_black_wolf_consulting_williams_manny_inc.pdf. Similar activity in Colorado resulted in fraud convictions in 2012. *See* https://denver.cbslocal.com/2011/04/05/health-plan-founder-faces-money-laundering-charges/ and https://www.denverpost.com/2012/03/30/insurance-executive-sentenced-to-5%C2%BD-years-for-fraud/ (reports of individual operating a self-funded "insurance" scheme for small employers who pleaded guilty to fraud and money-laundering) (both accessed April 6, 2021).

**iii. Standards established to regulate non-conventional health coverage arrangements seek to protect consumers.**

Standards such as described above – for example, that the organization be licensed, financially solvent, and formed for a *bona fide* purpose other than procuring insurance – have helped to minimize the consumer harm that would otherwise flow from unregulated MEWAs, including association or other loosely-affiliated arrangements. However, these schemes spring up with some frequency, and are functionally little more than a mechanism to pool the "membership fees" of participants. These schemes are very likely to jeopardize consumers when the schemes later lack the financial wherewithal to pay individual participants' claims. For administrators of an unregulated entity providing (or purporting to provide)

health coverage, it is but a few short steps either to miscalculate the financial costs and be forced into insolvency, or, with less noble intentions, to yield to the temptation to skim funds from its accounts and then walk away from its promises of coverage.

Uniform insurance standards and regulatory oversight of insurance companies allow for a level playing field, which supports a competitive market, and also provides an assurance that *all* entities functioning as insurers are financially sound. Insurance companies must have the actuarial acumen to accurately price health coverage, and the expertise needed to appropriately reserve funds to pay for claims that will be incurred at a future date. State insurance regulators monitor insurance companies to assure that they are solvent and meet other consumer-protective standards.

In sum, whether the entity is the type of MEWA examined by the GAO in 2004, an insured MEWA, a MEWA under the guise of an association health plan, or a purported single employer plan whose "workers" have been found to not be actual employees or *bona fide* partners at all, *see, e.g.,* U.S. Department of Labor Advisory Opinion 2020-01A (January 24, 2020), solvency issues and the potential for consumer harm continue to exist. For the protection of the individuals who might be lured to schemes offered outside of the conventional health insurance markets, health coverage purported to be offered through these arrangements must

be subject to regulatory oversight to assure that every impacted individual is fully informed about the coverage, that the coverage is available regardless of the individual's health status, and that sufficient funds are there to pay claims.

## II. THE DATA MARKETING ARRANGEMENT IS A SUBTERFUGE THAT VIOLATES THE PURPOSE AND PROTECTIONS OF LEGITIMATE HEALTH COVERAGE, EXPOSING POTENTIAL INDIVIDUAL PARTICIPANTS TO MULTIPLE LAYERS OF DISCRIMINATION.

Against the background set forth above, the Data Marketing construct should be seen for what it is: an illegitimate effort to dodge appropriate consumer protection regulation.

### A. The Data Marketing Scheme Is Not the Group Coverage It Purports to Be.

Data Marketing purports to have landed on a scheme that would enable it to sell individual coverage, but call itself a large single employer in an effort to avoid the regulation of individual coverage. If permitted, Data Marketing would be able to pick and choose who may participate in its scheme when an individual seeks to enroll, and then to remove individuals from its coverage arrangement if the claims of those individuals rise to an unanticipated level; and at the same time charge a rate that is not monitored by any regulatory authority and may be excessive or

unfairly discriminatory. In other words, Data Marketing and schemes of its ilk seek to lay claim to being a single employer self-funded plan to evade state oversight, even while failing to satisfy the *bona fide* employee benefit framework within which the federal Department of Labor regulates single employer ERISA plans.

The Data Marketing scheme tries to frame individuals who merely allow their electronic data to be mined as "limited partners" and therefore "working owners" of a single employer. But the United States Department of Labor, after evaluating the representations of Data Marketing's counsel, correctly concluded that the individuals drawn to the scheme are not employees or *bona fide* partners at all. U.S. Department of Labor Advisory Opinion 2020-01A (January 24, 2020).

In the arena of health coverage, the shortcomings of calling these "limited partners" workers, and particularly working owners of a single employer, are brought into stark relief. As explained above, a large employer may provide a single-employer health coverage arrangement, whether self-funded or insured. ERISA prohibits states from deeming *bona fide* employers to be insurance companies because that is not what they are; rather, their benefit plans are purely incidental to the operation of some other business. A self-funded benefit plan is supported by the full resources of the self-funded business, not sustained entirely by contributions the participants themselves make to the plan. For these reasons,

Congress determined that it would be inappropriate to subject self-funded employers to laws designed to regulate commercial insurers that sell insurance to the general public. *See generally* 29 U.S.C. §§ 1002(1), 1003(a); ERISA OVERSIGHT REPORT OF THE PENSION TASK FORCE OF THE SUBCOMMITTEE ON LABOR STANDARDS, HOUSE COMMITTEE ON EDUCATION AND LABOR, H.R. Doc. No. 342-9, 94th CONG., 2d Sess. (Jan. 3, 1977), at 8, available at https://ufdc.ufl.edu/AA00022220/00001/3j. In short, Data Marketing's scheme is not a legitimate employment-based arrangement as it claims to be and does not merit the safe harbor of the ERISA deemer clause.

### B. Data Marketing's Self-serving Representations Should Not Bar States from Acting to Protect their Consumers.

Moreover, for the lower court to declare the scheme a valid single employer self-funded scheme, based only on the self-serving statements of Data Marketing, and then to suggest in *dicta* that a state that is not a party to the lawsuit would be precluded from looking at the arrangement as it actually exists, is even more disconcerting. Regardless of how Data Marketing operates in fact, the lower court suggests that Data Marketing should be permitted as a matter of law to operate in every state, all the while hiding behind its bald representations. *See Data Marketing Partnership, et al. v. U.S. Dept. of Labor, et al.*, 2020 WL 5759966 at *6-*9 (N.D. Tx., Sept. 28, 2020)("The Department has spoken its last words on the

legal issue in dispute, now asking LPMS to risk violating state laws if it ignores the Department's Opinion … Because the Court finds the Department's Opinion arbitrary and capricious under the APA and contrary to law under ERISA, the Court sets aside the Department's Opinion and finds the Plan is governed by Title I of ERISA."). Notwithstanding the lower court's declaration, a state regulatory body that is not a party to the lawsuit is not bound by that declaration in *dicta*. *See* 18A Fed. Prac. & Proc. (3d ed.) (Wright and Miller) § 4558 Government and Official Litigation ("It is clear that state and federal governments are separate parties for *res judicata* purposes, so that litigation by one does not bind another")*; see also In re Il Nam Chang*, 539 B.R. 733, 738 (Bankr. M.D. Pa. 2015) ("The cardinal principle for judicial restraint is that if it is not necessary to decide more, it is necessary not to decide more").

### C. The Data Marketing Scheme Exposes Participants to Harm at Every Turn.

The individuals who are led to believe that they may access health coverage through the Data Marketing scheme are exposed to harm in much the same way as individuals purportedly covered by self-funded MEWAs and other unlicensed arrangements. First, at initial exposure and throughout any interaction with the entity, individuals may be subject to deceptive or misleading marketing and other

communications. With no oversight from an objective regulator, a Data Marketing-type entity may distribute appealing marketing materials, but with details buried in the fine print, if included at all. For those consumers who opt for this purported coverage, there would be an immediate negative impact due to confusion, as well as downstream consequences in terms of uncompensated care, medical bankruptcies, and problems with access to coverage.

Second, at the time of application, there would be nothing to prevent a Data Marketing-type scheme from discriminating against individuals with pre-existing conditions, or with "unfavorable" characteristics such as age or gender, so that the only individuals the entity would include in its arrangement would be those with few, if any, anticipated claims. This would likely result in the healthiest individuals choosing these arrangements, leaving sicker individuals to seek coverage in the existing individual and small group markets, resulting in those markets having increasingly higher individual and small group premiums year-over-year due to adverse selection. Thus, not only would it be possible for these schemes to discriminate based on health status and other criteria, but they would invite risk selection that would destabilize health insurance markets generally.

Third, there would be no assurance of comprehensive coverage. Single employer self-funded coverage, which is what Data Marketing claims its coverage to be, is not subject to minimum standards such as essential health benefits. [42]

U.S.C. § 300gg-6(a). Thus, the coverage may be devoid of comprehensive hospitalization or ambulatory service benefits; maternity care; mental health benefits and substance use disorder coverage; and prescription drug coverage requirements.[9] Even for the healthier individuals who take advantage of access to these schemes, ERISA preempts the application of existing state mandates to single employer self-funded health coverage, so individuals expecting coverage that at least complies with minimum requirements applicable in their home state may find themselves lacking adequate coverage for basic or crucial health care needs. As individual participants find that they do not have coverage for these needs, they will likely be driven to ACA-compliant plans, which ultimately must accept them under federal guaranteed issue rules. *See* 42 U.S.C. §§ 300gg-1 – 300gg-2. As noted above, this would tend towards the creation of a *de facto* high-risk pool in the ACA-compliant plans, driving up premiums. Moreover, if an individual participant learns mid-year of inadequacies of the arrangement's coverage relative to the individual's health needs, it is unlikely that the individual would be able to secure comprehensive coverage until the next calendar year. *See* 42 U.S.C. § 300gg-1 and 45 C.F.R. §§ 147.104, 155.420 (limiting open enrollment periods in the individual and small group markets).

---

[9] For the reasons stated above – the need for an employer to maintain itself as a going concern, and to maintain its reputation, shareholder value, goodwill, and a healthy and satisfied workforce – legitimate single employer health coverage typically includes coverage of these benefits.

Fourth, individuals who succeed in getting purported coverage through a Data Marketing-type scheme, but who then make claims for coverage, may be subjected to post-claims underwriting. Since the coverage need not be guaranteed available, it may be underwritten to exclude individuals from coverage. But even for those individuals who are accepted into the arrangement, there is nothing to prevent the administrator of the arrangement from questioning the information in an application after an individual gets the coverage and makes a claim; such post-claim underwriting may be used to deny claims.

Fifth, an individual who buys into this arrangement has no assurance that the arrangement will last the entire year, or that at the end of the year they will be guaranteed renewal of their coverage. As the arrangement is described, a "limited partner" has none of the legal protections afforded to policyholders under insurance laws, or to employees under labor laws. Regulated insurance has protections in place to assure the continuation of coverage for the entire policy term, and is guaranteed renewable. *See* 42 U.S.C. § 300gg-2. Even where a group policy might be terminated mid-year, the termination is generally subject to advance notice,[10] and would be applicable to the entire group, not solely to the one or more individuals in the group that may have significant claims.

[10] *See, e.g.,* Haw. Rev. Stat. § 431:10A-105.6 (requiring an insurer to provide 30 days' advance written notice to group plan enrollee or to individual plan primary subscriber when coverage is

Finally, individuals subject to a Data Marketing-type scheme will not benefit from the state regulatory fiscal guardrails that underpin the insurance industry. There will be no assurance of appropriate actuarial analysis of the risk being undertaken so that the rates are not excessive, inadequate, or unfairly discriminatory. There will be no solvency review to assure that there is adequate funding and sufficient reserves. There will be no regulatory oversight to assure that the administrative expenses are appropriate and not excessive. And if the self-funded entity becomes insolvent, it is not covered by the state guaranty associations as are insurance companies; the individuals themselves would be responsible to pay any unpaid claims.[11]

In short, when stripped of the illusory notion that the "limited partners" are workers, the Data Marketing scheme is merely a scheme to avoid state regulation, sidestepping state consumer protections for the individuals it is purporting to

rescinded for reasons other than non-payment of premium); ORS 743B.310 (same); 24-A Me. Rev. Stat. § 2809-A(1-A) (issuer must give 10 days' advance notice to each employee when group coverage is cancelled or nonrenewed for any reason, unless issuer has notice that replacement coverage is in place). *See also, e.g., Olkowski v. Prudential Ins. Co. of America,* 597 F. Supp. 1197, 1199 (E. D. Pa. 1984) ("The insurer had the continuing obligation to notify the insured of the policy's impending termination and the insured's option to convert").

[11] *See, e.g.,* Haw. Rev. Stat. §§ 431:16-201, *et seq* (Hawai`i Life and Disability Insurance Guaranty Association Act); §§ 59A-42-1 to 17 NMSA 1978 (New Mexico Life and Health Guaranty Association Act); Or. Rev. Stat. §§ 734.750 (Oregon Life and Health Insurance Guaranty Association Act); 40 P.S. §§ 991.1701, *et seq*. (by which Pennsylvania Life and Health Insurance Guaranty Association was established and functions); Vt. Stat. Ann. tit. 8, § 4151, *et seq.* (Vermont Life & Health Guaranty Association Act).

cover. Permitting Data Marketing and schemes of its ilk to proliferate will harm individuals at every step: from marketing, to eligibility and enrollment, to claims submission, to the risk of denial of a claim or the loss of coverage altogether, and finally to being abandoned in the event of insolvency.

## CONCLUSION

For all of the foregoing reasons, to protect consumers of health coverage throughout the United States, the Departments respectfully urge this Court to reverse the District Court's decision.

Respectfully submitted,

KATHRYN M. SPEAKS
Senior Litigation Counsel
AMY G. DAUBERT
Chief Counsel
SANDRA L. YKEMA
Department Counsel
1341 Strawberry Square
Harristown State Office Building. No. 1
Harrisburg, PA 17120
Email: adaubert@pa.gov
Email: kspeaks@pa.gov
Email: sykema@pa.gov

By: /s/ KATHRYN MCDERMOTT SPEAKS
Kathryn McDermott Speaks

Counsel of Record for *Amici Curiae* brief

Date: April 7, 2021

(Additional counsel listed on next pages)

Kyle McDaniel
Abby Chestnut
Assistant Attorneys General
Office of Attorney General
Colorado Department of Law
Business and Licensing Section,
Insurance Unit
1300 Broadway, 8th Floor
Denver, CO 80203
Email: Kyle.McDaniel@coag.gov
Email: Abby.Chestnut@coag.gov

Jared T. Kosky
General Counsel
Connecticut Insurance Department
153 Market Street
7th Floor,
Hartford, CT 06103
Email: Jared.Kosky@ct.gov

Adam Levi
Andre Beard
Assistants General Counsel
Office of the General Counsel
District of Columbia Department of
Insurance, Securities & Banking
1050 First Street, NE, Suite 801
Washington, D.C. 20002
Email: adam.levi@dc.gov
Email: andre.beard@dc.gov

Paul Yuen
Supervising Attorney
Insurance Division
Department of Commerce and
Consumer Affairs
335 Merchant Street, Room 213
Honolulu, HI 96813
Email: pyuen@dcca.hawaii.gov

Robert Alan Wake
General Counsel
Maine Department of Professional and
Financial Regulation, Bureau of
Insurance
34 State House Station
Augusta ME 04333-0034
Email: robert.a.wake@maine.gov

J. Van Lear Dorsey
Assistant Attorney General
Maryland Insurance Administration
200 St. Paul Place, Suite 2700
Baltimore, MD 21202
Email: van.dorsey@maryland.gov

Bryan E. Brock
General Counsel
New Mexico Office of Superintendent of Insurance
P.O. Box 1689
Santa Fe, NM 87504-1689
Email: bryan.brock@state.nm.us

Pramela Reddi
Assistant Attorney General
Health & Human Services Section
General Counsel Division
Oregon Department of Justice
1162 Court St NE
Salem, OR 97301-4096
Email: Pramela.Reddi@doj.state.or.us

Frank A. Marnell
Senior Legal Counsel
Division of Insurance
South Dakota Department of Labor and Regulation
124 S Euclid Ave
Pierre, South Dakota 57501
Email: Frank.Marnell@state.sd.us

Gavin Boyles
General Counsel
Vermont Department of Financial Regulation
89 Main St.
Montpelier VT 05620-3101
Email: Gavin.Boyles@vermont.gov

Marta DeLeon
Assistant Attorney General
Counsel to the Washington State Office of the Insurance Commissioner
Washington State Office of the Attorney General
1125 Washington St. SE
Olympia, WA 98501
Email: marta.deleon@atg.wa.gov

**CERTIFICATE OF COMPLIANCE**

This *amici* brief complies with the type-volume limitation of Federal Rule of Appellate Procedures 29(a)(5) and 32(a)(7)(B)(i) and Fifth Circuit Rule 29.3 and 32.2 because it contains **5,718** words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This *amici* brief complies with the typeface requirements of Fed. R. App. P. Rule 32(a)(5) and the type-style requirement of Fed. R. App. P. Rule 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point type for text.

Dated: April 7, 2021

/s/ KATHRYN MCDERMOTT SPEAKS
Kathryn McDermott Speaks

# CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2021, I caused a true and correct copy of the foregoing to be served on all counsel of record through the Court's CM/ECF system.

I have also sent a copy to counsel for Plaintiffs-Appellees via email and first class mail addressed as follows:

Reginald L. Snyder
Taylor English Duma LLP
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339

Dated: April 7, 2021

/s/ KATHRYN MCDERMOTT SPEAKS
Kathryn McDermott Speaks