No. 20-11179

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

DATA MARKETING PARTNERSHIP, L.P., *et al.*,
PLAINTIFFS-APPELLEES,

v.

UNITED STATES DEPARTMENT OF LABOR, *et al.*,
DEFENDANTS-APPELLANTS.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT OF TEXAS

**BRIEF OF THE DISTRICT OF COLUMBIA AND
THE STATES OF CALIFORNIA, COLORADO, CONNECTICUT,
DELAWARE, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS,
MICHIGAN, MINNESOTA, NEVADA, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA, PENNSYLVANIA, RHODE ISLAND,
VERMONT, VIRGINIA, WASHINGTON, AND WISCONSIN
AS AMICI CURIAE IN SUPPORT OF DEFENDANTS-APPELLANTS**

KARL A. RACINE
Attorney General for the District of Columbia

LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Principal Deputy Solicitor General

ASHWIN P. PHATAK
Deputy Solicitor General

HARRISON M. STARK
Assistant Attorney General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

# TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF INTEREST OF
AMICI CURIAE ................................................................................1

SUMMARY OF ARGUMENT ..............................................................3

ARGUMENT .......................................................................................6

    I.     Questions Over ERISA's Scope Are Foundationally Questions
           About State Versus Federal Authority .................................6

           A.     States have long regulated the business of insurance under
                  their police power........................................................7

           B.     Where applicable, ERISA preempts state regulation ...............11

    II.    All Three Branches Of The Federal Government Have Worked
           To Ensure That ERISA Preserves States' Historic Police Power
           Over Insurance ....................................................................13

    III.   The District Court's Interpretation Trammels States' Police
           Power By Expanding ERISA's Scope And Aggrandizing Federal
           Authority ...........................................................................19

CONCLUSION ...................................................................................22

# TABLE OF AUTHORITIES

## *Cases*

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*,
468 U.S. 491 (1984)..................................................................................14

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*,
519 U.S. 316 (1997)..................................................................................17

*Cal. State Auto. Ass'n Inter-Ins. Bureau v. Maloney*, 341 U.S. 105 (1951)..............8

*Country-Wide Ins. Co. v. Harnett*, 426 F. Supp. 1030 (S.D.N.Y.),
*aff'd*, 431 U.S. 934 (1977) .........................................................................7

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806 (1997)..........17

*Emps. of Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*,
411 U.S. 279 (1973)..................................................................................13

*FMC Corp. v. Holliday*, 498 U.S. 52 (1990) ...........................................................15

*Massachusetts v. Morash*, 490 U.S. 107 (1989) ....................................................17

*MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*,
957 F.2d 178 (5th Cir. 1992) ................................................................20

*Meredith v. Time Ins. Co.*, 980 F.2d 352 (5th Cir. 1993) .......................................20

*N.Y. Life Ins. Co. v. Deer Lodge Cty.*, 231 U.S. 495 (1913)....................................9

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995)........................................................... 3, 17, 18, 19

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ....................................19

*Noble State Bank v. Haskell*, 219 U.S. 104 (1911)....................................................8

*Paul v. Virginia*, 75 U.S. 168 (1868) ........................................................................9

*Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002)............................ 16, 17

*Rutledge v. Pharm. Care Ass'n*, 141 S. Ct. 474 (2020) ...........................................17

*Schwartz v. Gordon*, 761 F.2d 864 (2d Cir. 1985) .................................................11

*Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*,
    359 U.S. 65 (1959)..........................................................................................7

*United States v. Se. Underwriters Ass'n*, 322 U.S. 533 (1944) ...............................9

## Statutes and Regulations

1851 N.H. Laws 1072 .............................................................................................8

29 C.F.R. § 2510.3-40............................................................................................18

29 U.S.C. § 1001 ....................................................................................................11

29 U.S.C. § 1002 ....................................................................................................19

29 U.S.C. § 1003 ....................................................................................................12

29 U.S.C. § 1144 ............................................................................................ passim

Pub. L. No. 97-473, 96 Stat. 2605 (1983)..............................................................16

Pub. L. No. 79-15, 59 Stat. 33 (1945)....................................................................10

## Executive and Legislative Materials

128 Cong. Rec. 30,356 (1982) ...............................................................................16

DOL Op. No. 2020-01A (Jan. 24, 2020) ................................................................20

S. Rep. No. 93-127 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4838...................11

U.S. Dep't of Labor, *MEWAs Multiple Employer Welfare Arrangements*
    *Under the Employee Retirement Income Security Act (ERISA): A Guide*
    *to Federal and State Regulation* (Aug. 2013) ....................................................18

U.S. Gov't Accountability Off., GAO-04-312, *Private Health Insurance: Employers and Individuals are Vulnerable to Unauthorized or Bogus Entities Selling Coverage* (2004) ................................................................. 13, 15

*Other Authorities*

Christopher C. French, *Dual Regulation of Insurance*, 64 Vill. L. Rev. 25 (2019) .................................................................8

Spencer L. Kimball & Barbara P. Heaney, *Federalism and Insurance Regulation: Basic Source Materials* (1995)..............8

Mila Kofman & Karen Pollitz, *Health Insurance Regulation by States and the Federal Government: A Review of Current Approaches and Proposals for Change*, J. of Ins. Reg., Summer 2006 .............................................................10

Nat'l Ass'n of Ins. Comm'rs, *Health and Welfare Plans Under the Employee Retirement Income Security Act: Guidelines for State and Federal Regulation* (2019) ........................................................................ 15, 16

Nat'l Ass'n of Ins. Comm'rs & Ctr. for Ins. Pol'y Rsch., *State Insurance Regulation* (2011) .....................................................9

Nat'l Conf. of State Legs., *Health Innovations State Law Database* (Jan. 31, 2021)......................................................................10

Eric Nordman, *The Relevance of the McCarran-Ferguson Act*, CIPR Newsletter (Ctr. for Ins. Pol'y Rsch., Kansas City, Mo.), Aug. 2017......10

Christen Linke Young, USC-Brookings Schaeffer Initiative for Health Pol'y, *Taking A Broader View of "Junk Insurance"* (July 2020).................................10

## INTRODUCTION AND STATEMENT OF INTEREST OF AMICI CURIAE

In the judgment below, the district court ordered the Department of Labor to treat Data Marketing Partnership's benefits arrangement—whereby users obtain health insurance in exchange for sharing data as they browse the Internet—as an "employee benefit plan" under the Employee Retirement Income Security Act of 1974 ("ERISA").  As the Department of Labor's brief explains, that conclusion does not comport with either ERISA or the Administrative Procedure Act.  The District of Columbia and the states of California, Colorado, Connecticut, Delaware, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin submit this brief as amici curiae to emphasize another deficiency in the district court's analysis: it disregarded the significant federalism issues presented by this case.[1]

Under ERISA's preemption provision, *bona fide* self-insured single-employer ERISA plans are immune from direct state insurance regulation.  But as the text of ERISA and decades of Supreme Court jurisprudence confirm, nothing in the statute supplants states' historic police power to regulate insurance more broadly by

---

[1]    The Amici States submit this brief as expressly authorized by Federal Rule of Appellate Procedure 29(a)(2), which provides that "[t]he United States or its officer or agency or a state may file an amicus brief without the consent of the parties or leave of court."

protecting residents from fraud, financial insolvency, and substandard insurance coverage. Thus, ERISA-covered welfare plans that provide benefits through the purchase of insurance remain subject to indirect regulation because the coverage they provide remains fully subject to state law. The history of ERISA enforcement, however, reveals a surfeit of schemes calculated to cloak the sale of health coverage to employers and individuals in the costume of an ERISA plan in order to evade the consumer protections of state insurance regulation. Congress, the Supreme Court, and the U.S. Department of Labor have therefore approached questions about ERISA's preemptive reach carefully to ensure that ERISA's provisions do not crowd out states' ability to faithfully enforce their historic police powers over insurance regulation. And with good reason: ERISA's requirements—which concern fiduciary duties, disclosure requirements, and reporting standards—do not substantively regulate insurance in all the ways necessary to protect the public. Our dual system has given much of that role to the states.

Fundamentally, questions about ERISA's preemptive scope are questions about the allocation of power in a federal system. The Amici States therefore have a critical interest in protecting their historic police powers to ensure the health and well-being of their residents through insurance regulation. As explained in detail below, by embracing the "uncritical literalism" that the Supreme Court has repeatedly rejected, *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers*

*Ins. Co.*, 514 U.S. 645, 656 (1995), the district court radically expanded the definitional scope of entities regulated by ERISA, unlawfully usurping states' historic role over insurance regulation expressly preserved by ERISA's insurance saving clause. The district court's judgment therefore effects a power shift from the states to the federal government—over the federal government's own objections. This Court should reverse.

## SUMMARY OF ARGUMENT

1. Foundationally, questions over ERISA's definitional scope implicate the proper allocation of power between the states and the federal government. As early as the Founding era, insurance was considered a local concern, and insurance regulation constituted a paradigmatic use of states' historic police power. ERISA did not disturb this landscape. As its name suggests, the Employee Retirement Income Security Act is concerned with pension and welfare plan management in the traditional employer-employee context, not with the regulation of insurance more broadly. Congress did not grant the federal government the power to regulate the marketing, solvency, and suitability of self-insured single-employer plans because employer plan sponsor interests aligned with those of their employees and thus such regulation, whether state or federal, would have been an unwanted and unnecessary intrusion on the employment relationship. ERISA therefore contains few of the substantive provisions concerning licensing requirements, rating restrictions, trade

practice standards, or solvency guarantees contained in state insurance regulation. But to ensure that the Act properly protects pension plans and enables the efficient administration of employee welfare plans, ERISA preempts "any and all State laws insofar as they . . . relate to any employee benefit plan." 29 U.S.C. § 1144(a). For this reason, the question of what health coverage arrangements qualify as *bona fide* ERISA "employee benefit plans" significantly affects the proper balance between state and federal authority.

2. Precisely because ERISA's preemption provision risks intruding into sensitive areas of historic state regulation, all three branches of the federal government have vigilantly policed the Act's definitional boundaries to ensure that ERISA's scope remains properly cabined. First, Congress expressly codified this intent in ERISA's original language by including a saving clause to preserve state insurance regulation, and later amended ERISA to clarify that states retain authority over substantive insurance regulation for multiple employer welfare arrangements, even when such entities are also ERISA-covered plans. Second, the Supreme Court has set clear interpretive rules for construing ERISA, repeatedly reaffirming that courts must read the Act against the sensitive backdrop of state oversight in this area. Third, the Department of Labor has implemented ERISA to carefully limit the Act's regulatory scope and facilitate state regulation over insurance providers and markets. Accordingly, all three branches of the federal government have repeatedly reached

the uncontroversial conclusion that ERISA was never intended to supplant states' traditional role in regulating insurance and protecting consumers in settings where health coverage was not offered as an incident of an authentic employment relationship, but marketed to multiple employers or discrete individuals.

3. The district court ignored these well-settled principles of federalism. Instead, it concluded that Data Marketing Partnership's benefits arrangement—whereby participants obtain health insurance in exchange for sharing data as they browse the Internet—was an "employee benefit plan" under ERISA. That conclusion eviscerates the careful limits that Congress, the Supreme Court, and the Department of Labor have placed on ERISA by limiting its preemption to plans in genuine employment contexts. In this case, there is no evidence that the limited partners of Data Marketing Partnership are meaningfully employed or perform any services on its behalf. The sole "service" that they perform is allowing the installation of software to their personal electronic devices so that their personal data can be tracked, mined, and sold to third parties. If unscrupulous insurance providers could avoid state regulation simply by *marketing* insurance to individual "users" who passively provide data through everyday use of personal devices, ERISA's carefully cabined limits would cease to exist and states would lose a significant portion of their historic oversight authority over insurance markets.

**ARGUMENT**

I.    **Questions Over ERISA's Scope Are Foundationally Questions About State Versus Federal Authority.**

Since the Nation's earliest days, states have regulated the business of insurance. This regulatory authority, a paradigmatic exercise of states' historic police power, is critical to protecting individuals and companies from catastrophic financial loss.

ERISA is not nominally concerned with insurance regulation. But where applicable, ERISA's preemption provision shields certain entities from state oversight even where they provide a form of insurance. Whether a particular benefits arrangement falls under ERISA is therefore critically important: non-ERISA plans are subject to the full suite of state regulation, while self-insured ERISA plans generally are not.[2] Thus, definitional questions about what qualifies as an "ERISA plan" implicate fundamental issues of federalism and the division of state versus federal authority.

---

[2]    The exception, of course, is multiple employer welfare arrangements, or MEWAs, some of which qualify as ERISA plans but also remain subject to state insurance regulation. MEWAs' unusual shared status is the direct result of Congressional amendments to ERISA, passed in the wake of widespread consumer harm facilitated by promoters claiming that MEWAs are immune from state insurance oversight. *See infra*, Section II.

### A. States have long regulated the business of insurance under their police power.

In our federal system, "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985). Insurance is key to protecting health and safety: it ensures the physical and economic well-being of citizens by distributing risk and allowing individuals to structure their lives free from the danger of catastrophic financial loss. As the Supreme Court has recognized, insurance itself is "a concept which [takes] its coloration and meaning largely from state law, from state practice, from state usage." *Sec. & Exch. Comm'n v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69 (1959).

Recognizing that insurance is, by definition, "an industry that is vested with public interest," Ronald W. Klein, *A Regulator's Guide to the Insurance Industry* 1 (2d. ed 2005),[3] courts have consistently held that its regulation is quintessentially "a proper subject for the state's exercise of its police power," *Country-Wide Ins. Co. v. Harnett*, 426 F. Supp. 1030, 1035 (S.D.N.Y.), *aff'd*, 431 U.S. 934 (1977). Indeed, the Supreme Court has emphasized that insurance is "a business to which the government has long had a 'special relation'" and that what is traditionally "said about the police power—that it 'extends to all the great public needs' and may be

---

[3]     *Available at* https://bit.ly/31AxjzQ.

utilized in aid of what the legislative judgment deems necessary to the public welfare—is peculiarly apt when the business of insurance is involved." *Cal. State Auto. Ass'n Inter-Ins. Bureau v. Maloney*, 341 U.S. 105, 109 (1951) (quoting *Noble State Bank v. Haskell*, 219 U.S. 104, 111 (1911)).

State regulation of insurance, accordingly, has a pedigree that precedes this Nation's creation. Beginning with Benjamin Franklin's "Philadelphia Contributorship for Insuring Houses from Loss by Fire" in the mid-1700s, *see* Christopher C. French, *Dual Regulation of Insurance*, 64 Vill. L. Rev. 25, 37 (2019), and extending to New Hampshire's first formal agency dedicated to insurance regulation formed in 1851, *see* 1851 N.H. Laws 1072 (establishing a "board of insurance commissioners" authorized "to make personally a full examination into the condition of each [insurance] company and the management of its affairs"), insurance regulation has long had a local dimension. *See generally* Spencer L. Kimball & Barbara P. Heaney, *Federalism and Insurance Regulation: Basic Source Materials* 7 (1995) (describing the history of state insurance regulation). That local oversight of insurance makes good sense. Although regulators broadly share the same goals—ensuring that "solvent insurers . . . are financially able to make good on the promises they have made" and that providers "treat policyholders and claimants fairly," Nat'l Ass'n of Ins. Comm'rs & Ctr. for Ins. Pol'y Rsch., *State*

*Insurance Regulation* 2 (2011)[4]—the mechanics of risk allocation and loss prevention are necessarily context-specific. States are often best positioned to ensure that insurance markets are accessible to the public, responsive to local social and economic conditions, and include adequate protections for a local polity's particular needs.

Even amidst the growing complexity of insurance markets and the national implications of insurance policy, Congress has taken extraordinary steps to ensure that states retain their historic power over insurance regulation. In 1944, the Supreme Court ruled that insurance constituted interstate commerce subject to Congress's Article 1 authority, *United States v. Se. Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944), overruling a body of precedent deeming insurance a purely local matter beyond the reach of federal regulation, *see, e.g.*, *N.Y. Life Ins. Co. v. Deer Lodge Cty.*, 231 U.S. 495, 502-12 (1913); *Paul v. Virginia*, 75 U.S. 168, 182-85 (1868). In response to the Court's ruling, Congress took unprecedented action: it *returned* that power to the states. The McCarran-Ferguson Act of 1945 declared, as a matter of national policy, that the "continued regulation and taxation by the several States of the business of insurance is in the public interest," and codified, as a rule of statutory interpretation, that "silence on the part of the Congress shall not be

---

[4]    *Available at* https://bit.ly/3rGosHn.

construed to impose any barrier to the regulation or taxation of such business by the several States." Pub. L. No. 79-15, 59 Stat. 33 (codified at 15 U.S.C. § 1011).

As the experience of regulators and the Amici States makes clear, "[t]he McCarran-Ferguson Act is as relevant today as it was when it was adopted." Eric Nordman, *The Relevance of the McCarran-Ferguson Act*, CIPR Newsletter (Ctr. for Ins. Pol'y Rsch., Kansas City, Mo.), Aug. 2017, at 13. States continue to regulate insurance because the damage risked by fraudulent or unstable insurance is catastrophic—particularly in the area of health insurance. *See* Christen Linke Young, USC-Brookings Schaeffer Initiative for Health Pol'y, *Taking A Broader View of "Junk Insurance"* (July 2020).[5] Indeed, states presently rely on an array of tools to protect the public from fraudulent or insolvent health insurance, including licensing requirements, form and rate filing policies, market conduct examinations, corrective actions, and, if necessary, enforcement proceedings. *See* Mila Kofman & Karen Pollitz, *Health Insurance Regulation by States and the Federal Government: A Review of Current Approaches and Proposals for Change*, J. of Ins. Reg., Summer 2006, at 77, 86-89; Nat'l Conf. of State Legs., *Health Innovations State Law Database* (Jan. 31, 2021) (providing a searchable database of recently enacted state health legislation, including insurance regulation addressing network adequacy,

---

[5]     *Available at* https://brook.gs/3m5pjQU.

price transparency, and payment reforms).[6]  These regulatory protections are core exercises of states' historic police power.

### B.    Where applicable, ERISA preempts state regulation.

As its name suggests, the Employee Retirement Income Security Act does not regulate insurance.  Instead, Congress passed ERISA to "remedy the abuses that existed in the handling and management of welfare and pension plan assets that constitute part of the fringe and retirement benefits held in trust for workers in traditional employer-employee relationships."  *Schwartz v. Gordon*, 761 F.2d 864, 868 (2d Cir. 1985) (citing S. Rep. No. 93-127, at 3-5 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 4838, 4839-42); *see Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n.8 (1985) ("[T]he crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and . . . ERISA was designed to prevent these abuses in the future.").  By its own terms, the Act guarantees "the continued well-being and security of millions of employees and their dependents," 29 U.S.C. § 1001(a), by "requiring the disclosure and reporting to participants . . . of financial and other information" related to welfare and pension plans, according to specific fiduciary standards, *id.* § 1001(b).  The Act contains few of the substantive provisions covered by state insurance regulation.

---

[6]    *Available at* https://bit.ly/2Pt0z9x.

Section 1003 defines ERISA's scope.  That section provides that the statute shall apply to "employee benefit plan[s]" that are "established or maintained" by an "employer" or "employee organization" "engaged in commerce or in any industry or activity affecting commerce." *Id.* § 1003(a).  ERISA also contains a preemption clause: the Act "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan." *Id.* § 1144(a).  In other words, state insurance regulations— subject to the exceptions below—do not reach *bona fide* employee benefit plans subject to ERISA.  Removing self-funded plans from state insurance regulation makes sense because these plans pose little risk to the general public: health plans offered in genuine employer-employee relationships—the quintessential ERISA "employee benefit plan"—are provided as tangential benefits to workers, not "marketed" to consumers like traditional insurance products.  Congress did not grant the federal government the power to regulate the marketing, solvency, and suitability of self-insured single-employer plans because employer plan sponsor interests aligned with those of their employees and thus such regulation, whether state or federal, would have been an unwanted and unnecessary intrusion on the employment relationship.

Given this preemption clause, however, and the relative freedom that self-funded employee benefit plans enjoy from state insurance oversight, including detailed licensing, solvency, and consumer protection laws, the question of what

health coverage arrangements qualify as *bona fide* ERISA "employee benefit plans" is critical to determining the bounds of state and federal regulation. Finding that ERISA applies dispositively shields a self-insured arrangement from states' historic police power over insurance regulation. For entities interested in exploiting gaps in oversight of insurance products, ERISA's preemption provision thereby offers an opportunity to invoke "employee benefit plan" status to "g[i]ve an appearance of being exempt from state insurance regulation when they should [be] subject to regulation." U.S. Gov't Accountability Off., GAO-04-312, *Private Health Insurance: Employers and Individuals are Vulnerable to Unauthorized or Bogus Entities Selling Coverage* 4 (2004).[7]

In short, ERISA's preemption provision represents a careful balance: the Act exempts *bona fide* ERISA employer health plans in the employment context from state regulation to achieve ERISA's objectives, while ensuring that insurance marketers are still subject to critical state oversight.

## II.    All Three Branches Of The Federal Government Have Worked To Ensure That ERISA Preserves States' Historic Police Power Over Insurance.

Conflicts between federal and state authority are inevitable; they contribute to "the tension inherent in our system of federalism." *Emps. of Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 298 (1973) (Marshall,

---

[7]    *Available at* https://bit.ly/3rLjXLV.

J., concurring).   Understandably, the differing priorities of the state and federal governments sometimes result in diverging regulatory schemes and conflicting objectives.   Even when Congress chooses not to invoke the Supremacy Clause to impose national uniformity in a particular area of law, *see Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 500-01 (1984), states and the federal government may have divergent visions of where regulatory authority should be vested.

Not here.   On the issue of insurance regulation, the federal system has spoken with one clear voice: ERISA intended to preserve states' historic police powers.   In overseeing ERISA's implementation, all three branches of the federal government have diligently policed the Act's preemption provision to ensure that states retain their traditional authority.

*First*, Congress has made clear that ERISA was not intended to supersede state authority over insurance regulation.   The clearest indication is in ERISA's text: immediately following the preemption clause, the Act states that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."   29 U.S.C. § 1144(b)(2)(A). As the plain meaning of this "saving clause" reflects, the provision "retains the independent effect of protecting state insurance regulation of insurance contracts purchased by employee benefit plans."   *FMC Corp. v. Holliday*, 498 U.S. 52, 64

14

(1990).  ERISA also contains a so-called "equal dignity" clause preserving the McCarran-Ferguson Act's earlier reach, expressly providing that "[n]othing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law."  29 U.S.C. § 1144(d); *see* Nat'l Ass'n of Ins. Comm'rs, *Health and Welfare Plans Under the Employee Retirement Income Security Act: Guidelines for State and Federal Regulation* 11 (2019) (describing the "equal dignity" clause). This plain language of ERISA confirms Congress's desire to preserve states' historic authority over insurance regulation.

Congress has reaffirmed its intent to preserve state authority through subsequent amendments.  Shortly after ERISA's passage, opportunistic insurance promoters sought to use ERISA's preemption provision as a shield to avoid state regulation by creating multiple employer groups—known as multiple employer welfare arrangements, or "MEWAs"—that purported to operate free from state oversight.  Unconstrained by state regulation, numerous MEWAs took exorbitant profit from their plans or charged bargain-basement premiums that left plans undercapitalized and unable to pay all eventual claims.  When MEWAs failed, they left unprotected consumers with millions of dollars in unpaid bills.  *See* U.S. Gov't Accountability Off., *Private Health Insurance: Employers and Individuals are Vulnerable to Unauthorized or Bogus Entities Selling Coverage*, *supra*, at 3-5.

Congressman John Erlenborn conducted field hearings to investigate abuse by these "operators of bogus insurance trusts," 128 Cong. Rec. 30,356 (1982), before introducing the Multiple Employer Welfare Arrangements Act of 1982.   These revisions—which became known as the Erlenborn-Burton amendments—reaffirmed states' historic regulatory power by clarifying state authority to regulate ERISA-covered MEWAs.  *See* 29 U.S.C. § 1144(b)(6) (added by Act of Jan. 14, 1983, Pub. L. No. 97-473, § 302(b), 96 Stat. 2605, 2612-14 (1983)).

*Second*, the Supreme Court has consistently reaffirmed that when Congress passed ERISA, it did not intend to supplant states' historic role in insurance regulation.    The  Court  has  observed  that,  read  literally,  ERISA  "seems simultaneously to preempt everything and hardly anything."[8]   *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 365 (2002).  In construing ERISA's scope, the Court focused principally on the express "qualification 'that the historic police powers of the States were not [meant] to be superseded by the Federal Act unless

---

[8]      In  addition  to  its  saving  clause,  ERISA  also  contains  a  "deemer  clause" providing  that  State  laws  "purporting  to  regulate  insurance"  cannot  deem  an employee benefit plan to be an insurance company simply for the purposes of state regulation.  29 U.S.C. § 1144(b)(2)(B); *see* Nat'l Ass'n of Ins. Comm'rs, *Guidelines for State and Federal Regulation*, *supra*, at 11-12 (explaining the "deemer clause"). This clause complements the saving clause by ensuring that states cannot interfere with ERISA's functioning simply by labeling a *bona fide* employee welfare plan as "insurance" when it is properly within ERISA's scope.  While courts may be forced to wrestle with the two clauses' interaction in specific preemption disputes, this case presents no deemer clause issue.

that was the clear and manifest purpose of Congress.'" *Id*. at 365 (alteration in original) (quoting *Travelers Ins. Co.*, 514 U.S. at 655). Given that express language, any inquiry into ERISA's scope must begin with "the starting presumption that Congress does not intend to supplant state law." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 813 (1997) (quoting *Travelers Ins. Co.*, 514 U.S. at 654).

The Court has warned that questions about ERISA preemption must therefore move beyond "uncritical literalism" and "look instead to the objectives of the ERISA statute as a guide." *Travelers Ins. Co.*, 514 U.S. at 656; *see Rutledge v. Pharm. Care Ass'n*, 141 S. Ct. 474, 480 (2020) (analyzing the scope of ERISA in light of "ERISA's objectives 'as a guide to the scope of the state law that Congress understood would survive'"). Those objectives, the Court has further explained, include "establish[ing] extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc*., 519 U.S. 316, 327 (1997) (quoting *Massachusetts v. Morash*, 490 U.S. 107, 115 (1989)). They provide no basis for overriding "laws in areas traditionally subject to local regulation"—like insurance—"which Congress could not possibly have intended to eliminate." *Id.* at 334 (quoting *Travelers Ins. Co.*, 514 U.S. at 668). And "nothing

in the language of" ERISA, the Court has explained, "indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." *Travelers Ins. Co.*, 514 U.S. at 661.

*Third*, mindful of the delicate balance between ERISA's preemption provision and state authority, the U.S. Department of Labor itself has long interpreted ERISA in ways that cabin federal authority and facilitate state regulation of insurance. The Department has promulgated regulations expressly limiting ERISA's scope to identify and weed out "agreement[s] under which [a] plan is established or maintained [a]s a scheme, plan, stratagem or artifice of evasion, a principal intent of which is to evade compliance with state law and regulations applicable to insurance." 29 C.F.R. § 2510.3-40(c)(2). In addition, the Department has maintained longstanding, comprehensive guidance for state regulators seeking to "provide a better understanding of the scope and effect of ERISA coverage" and to "facilitate State regulatory and enforcement efforts, as well as Federal-State coordination." U.S. Dep't of Labor, *MEWAs Multiple Employer Welfare Arrangements Under the Employee Retirement Income Security Act (ERISA): A Guide to Federal and State Regulation* 1 (Aug. 2013).

* * *

In short, authorities from across all branches of the federal government stand for the same uncontroversial conclusion: ERISA was never intended to supplant states' traditional role in regulating insurance and protecting consumers.

## III.     The District Court's Interpretation Trammels States' Police Power By Expanding ERISA's Scope And Aggrandizing Federal Authority.

The district court disregarded these well-established principles in its ruling below.  Instead, it embraced the "uncritical literalism" the Supreme Court has consistently rejected, *Travelers Ins. Co.*, 514 U.S. at 656, and stretched ERISA's coverage beyond the carefully crafted limits imposed by all three branches of the federal government.  By expanding the definition of a covered "ERISA plan," thereby expanding the Act's preemption of state insurance regulation, the court's novel reading effects a power shift, ceding states' historic authority to the federal government.  Nothing justifies this result.

ERISA applies only to plans stemming from a genuine employment-based relationship.  To be an ERISA "participant" in a plan, one must be an "employee or former employee of an employer," 29 U.S.C. § 1002(7), and an "employee" is "any individual employed by an employer," *id.* § 1002(6).  On one level, this definition "is completely circular and explains nothing." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).  But whatever the precise scope of these terms, at the very least, a claimant must establish the "two primary elements of an ERISA 'employee

welfare benefit plan' as defined by the statute: (1) whether an employer established or maintained the plan; and (2) whether the employer intended to provide benefits to its employees." *Meredith v. Time Ins. Co.*, 980 F.2d 352, 356 (5th Cir. 1993) (quoting *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 183 (5th Cir. 1992)).

Put simply, under Data Marketing Partnership's arrangement, it is not an "employer" and its participants are not "employees." As the Department of Labor correctly concluded, participants in Data Marketing Partnership's scheme fail to "perform any work for or through the partnership"; the participants "do not appear to report to any assigned 'work' location or otherwise notify the partnership that they are commencing their work"; and users "are not required to possess any particular work-related skills." DOL Op. No. 2020-01A 2 (Jan. 24, 2020). Instead, the only purported basis for an "employment" relationship is that participants "install specific software on their personal electronic devices that capture data as they browse the Internet or use those devices for their own purposes." *Id.*

The district court's conclusion that this scheme constituted an employment relationship under ERISA strips the statute's limiting terms of all meaning. Congress made a deliberate choice to cabin ERISA's preemptive reach to the narrow context of fringe workplace benefits, leaving states' historic oversight of insurance markets in place. But the insurance Data Marketing Partnership provides

is no workplace benefit. Rather, participants' contribution to Data Marketing Partnership is indistinguishable from the data generated by millions of Internet users every second. No one—especially not ERISA's drafters—would consider routine visitors to websites "employees," nor define insurance advertised to web users as an "employee benefit plan." If promoters could create a *bona fide* ERISA plan and avoid state regulation simply by seeking out "users" who passively provide data through everyday device-use, ERISA's boundaries would cease to exist and states would lose their regulatory authority over all suspect arrangements—even as Congress expressly did not give the federal government similar authority to step into the void. This Court should reject an interpretation that nullifies ERISA's saving clause and forces states to forfeit their historic police power in such a way.

# CONCLUSION

This Court should reverse.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

LOREN L. ALIKHAN
Solicitor General

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Principal Deputy Solicitor General

ASHWIN P. PHATAK
Deputy Solicitor General

HARRISON M. STARK
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
(202) 741-0649 (fax)
caroline.vanzile@dc.gov

April 2021

On behalf of:

MATTHEW RODRIQUEZ
*Acting Attorney General*
State of California

WILLIAM TONG
*Attorney General*
State of Connecticut

KWAME RAOUL
*Attorney General*
State of Illinois

BRIAN E. FROSH
*Attorney General*
State of Maryland

DANA NESSEL
*Attorney General*
State of Michigan

AARON D. FORD
*Attorney General*
State of Nevada

HECTOR BALDERAS
*Attorney General*
State of New Mexico

JOSHUA H. STEIN
*Attorney General*
State of North Carolina

PETER F. NERONHA
*Attorney General*
State of Rhode Island

MARK R. HERRING
*Attorney General*
Commonwealth of Virginia

JOSHUA L. KAUL
*Attorney General*
State of Wisconsin

PHILIP J. WEISER
*Attorney General*
State of Colorado

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

AARON M. FREY
*Attorney General*
State of Maine

MAURA HEALEY
*Attorney General*
Commonwealth of Massachusetts

KEITH ELLISON
*Attorney General*
State of Minnesota

GURBIR S. GREWAL
*Attorney General*
State of New Jersey

LETITIA JAMES
*Attorney General*
State of New York

JOSH SHAPIRO
*Attorney General*
Commonwealth of Pennsylvania

THOMAS J. DONOVAN, JR.
*Attorney General*
State of Vermont

ROBERT W. FERGUSON
*Attorney General*
State of Washington

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  I further certify that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 4,601 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14 point.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE